**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 22 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

19 SOLID WASTE DEPARTMENT
MECHANICS, SAM AGUILAR, RUDY
ARCHULETA, JR., EDWARD BACA,
PAUL BARBOA, M.E. BARRERAS,
GARY L. CHAVEZ, JOHNNY
CHAVEZ, ANTHONY DEMELLO,
MICHAEL GUTIERREZ, JIMMY
HERRERA, BILL LIPITZ, JOHN
LUJAN, FRANK ORTEGA, AARON
ROMERO, DONALD SCOTT, FRANK
SERNA, ARTURO TORRES, JR.,
JAMES VIGIL, and RORY WESSEL,

           Plaintiffs - Appellees,

    v.

CITY OF ALBUQUERQUE; LOUIS E.
SAAVEDRA, Mayor, individually and in
his official capacity; ARTHUR
BLUMENFELD, Ph.D., Chief
Administrative Officer, individually and
in his official capacity; LAWRENCE
RAEL, Assistant Chief Administrative
Officer, individually and in his official
capacity; DAVID CAMPBELL, City
Attorney and Chairman of the Substance
Abuse Task Force, individually and in his
official capacity,

           Defendants - Appellants.

No. 96-2177

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D. Ct. No. CIV-93-1385-JP)**

---

Charles W. Kolberg, Assistant City Attorney, City of Albuquerque, Albuquerque, New Mexico, appearing for Defendants-Appellants.

Paul S. Livingston, Albuquerque, New Mexico, appearing for Plaintiffs-Appellees.

---

Before **TACHA**, **BRORBY**, and **BRISCOE**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Plaintiffs are nineteen Solid Waste Department mechanics who originally filed suit in 1993 to challenge the constitutionality of the drug- and alcohol-testing policy of the City of Albuquerque as it was applied to them. The mechanics challenged the policy on several grounds. Germane to this appeal is the mechanics' assertion that the policy violated their right to be free from unreasonable searches as guaranteed by the Fourth Amendment.

### BACKGROUND

The mechanics' primary job responsibility is the repair of the City's fleet of large diesel trash trucks. Their work includes repairs to the brakes, steering, front end, hydraulics, and electrical systems of the trucks. They perform their work in an industrial

repair shop where large machines and replacement parts are mechanically lifted for repairs. They work under general supervision, and usually their work is not inspected by others before a repaired truck is returned to service. The mechanics are not authorized to drive City vehicles on the streets or highways.

The drug-testing policy under consideration here was initially set forth in 1991. The policy required employees with jobs requiring a commercial driver's license (CDL) to submit to and pass a substance abuse test before they could obtain or renew a CDL. In 1992, the City placed Mechanics III, a classification that includes the Solid Waste Department mechanics, on a list of job categories for which a CDL (and therefore a substance abuse test) was required. The policy also stated that no employee could operate or drive City vehicles or equipment that require a CDL without a current City vehicle/equipment operator's permit. Obtaining a permit, like a CDL, required that the applicant undergo a substance abuse test.

Both the plaintiffs and defendants moved for summary judgment on Fourth Amendment grounds. The district court entered judgment for the plaintiffs and struck down the City policy, concluding "that while the city has valid public interests in establishing a drug enforcement program, those interests do not outweigh the interference with individual liberty that results from requiring this particular class of employees—non-driving, solid waste mechanics—to undergo warrantless drug tests." 19 Solid Waste Dep't Mechanics v. City of Albuquerque, CIV No. 93-1385, slip op. at 11 (D.N.M. Oct.

11, 1994). In reaching this conclusion, the court examined in some detail the City's assertion that it instituted the drug testing policy because of concerns for workplace and public safety and employee health. The district court evaluated the City's proffered safety and health reasons and determined that they were not "compelling" enough under Supreme Court precedent to justify warrantless and suspicionless drug tests. Following the district court's decision, the City repealed the drug-testing policy. Subsequently, the district court awarded $2,700 in damages to the mechanics. The City now appeals that damage award by attacking the correctness of the district court's decision on the merits. The City argues the district court erred in granting the plaintiffs' motion for summary judgment by misapplying the balancing test that governs the constitutionality of urinalysis drug tests under the Fourth Amendment. The City asserts that a proper application of that balancing test should have led the district court to grant the City's motion for summary judgment. We affirm the decision of the district court.

## DISCUSSION

We first address the mechanics' assertion that the case should be dismissed as moot. After the district court granted summary judgment to the mechanics, the City revoked the drug-testing policy at issue. The district court, however, awarded the mechanics $2,700 in damages, and, at the time of oral argument, the plaintiffs also had a motion for attorney's fees pending in the district court. In order for the City to contest its liability for the damage award or for any attorney's fees, it must challenge the merits of

the underlying decision.  Thus, the City's liability for damages and attorney's fees as a result of the judgment against it "saves this cause from the bar of mootness."  Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 8 (1978).

We review a district court's grant or denial of summary judgment de novo.  See Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995).  Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See id.; Fed. R. Civ. P. 56(c).  The moving party is entitled to summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,587 (1986).  When applying this standard, we examine the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party.  See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

When a government employer requires its employees to submit to a urinalysis test for the purpose of detecting illegal drug use, the test is a search subject to the Fourth Amendment and must be reasonable.  See Benavidez v. City of Albuquerque, 101 F.3d 620, 623-24 (10th Cir. 1996).  Ordinarily, a search must be based on individualized suspicion of wrongdoing to be considered reasonable.  See id. at 624.  In some cases, however, where governmental concerns other than crime detection are at issue, the Supreme Court has allowed the government to require drug-testing even in the absence of

individualized suspicion. Three Supreme Court cases are illustrative. In Skinner v. Railway Labor Executives' Assoc., 489 U.S. 602 (1989), the Court upheld the constitutionality of federal regulations that require railroads to test employees involved in train accidents for drug use and allow railroads to test employees who violate certain safety rules. National Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989), decided the same day as Skinner, upheld the testing of Customs Service employees applying for positions involving interdiction of illegal drugs or requiring them to carry firearms. In Vernonia School District 47J v. Acton, 515 U.S. 646 (1995), the Court upheld the suspicionless urine testing of junior and senior high school student-athletes.

In each of the above Supreme Court cases, in evaluating the constitutionality of the respective testing programs, the Court balanced the intrusion on individuals' privacy interests against the promotion of legitimate governmental interests. See, e.g., Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652-53 (1995). Under that balancing equation, on one side, the Court examines the nature of the privacy interest upon which the search at issue intrudes and the character of the intrusion that is complained of. See Acton, 515 U.S. at 654, 658. On the other side of the balancing, the Court "consider[s] the nature and immediacy of the governmental concern at issue . . . and the efficacy of [the challenged test] for meeting it." Id. at 660.

In Chandler v. Miller, 117 S. Ct. 1295 (1997), the Supreme Court's most recent drug-testing case, the Court added a step to the analysis it had followed in Skinner, Von

Raab, and Acton.  See Todd v. Rush County Schools, 139 F.3d 571, 572 (7th Cir. 1998) (Ripple, J., dissenting from denial of rehearing en banc).  Prior to conducting the balancing, in surveying the public interests at issue, the Court said that we must specifically inquire into whether the drug-testing program at issue is warranted by a "special need."  See Chandler, 117 S. Ct. at 1303.  Only if we can say that the government has made that special need showing do we then inquire into the relative strengths of the competing private and public interests to settle whether the testing requirement is reasonable under the Fourth Amendment.  If the government has not made its special need showing, then the inquiry is complete, and the testing program must be struck down as unconstitutional.  Thus, the first, and ultimately decisive, question for this appeal is whether the City of Albuquerque's drug testing program is warranted by a special need.

We turn to the details of Chandler to understand what the government's special need showing requires.  Chandler involved a Georgia requirement that candidates vying for designated state offices certify that they have taken a drug test and that the test result was negative.  See id. at 1298.  Each candidate was required to present the certificate within 30 days before qualifying for nomination or election.  In arguing that the statute was constitutional, the State asserted that the certification requirement was justified "because the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts;

and undermines public confidence and trust in elected officials." Id. The Supreme Court rejected the State's arguments, stating that "[n]othing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity." Id. at 1303. The Court concluded that the State had not shown that the certification requirement was warranted by a special need. See id.

In reaching this conclusion, the Court identified how the government may demonstrate a special need for a suspicionless drug testing scheme. See id. 1301-04. Based on a detailed review of its decisions in Skinner, Von Raab, and Acton, the Chandler Court identified two general characteristics that we must now examine in the first instance, before any balancing occurs. First, the Court examined whether the proffered governmental concerns were "real" by asking whether the testing program was adopted in response to a documented drug abuse problem or whether drug abuse among the target group would pose a serious danger to the public. See id. at 1303. In Skinner, the record showed a "documented link between drug- and alcohol-impaired employees and the incidence of train accidents." Id. at 1301 (citing Skinner, 489 U.S. at 607-08). In Acton, there was evidence of an epidemic of drug use among students and related disciplinary problems in the schools. See Acton, 515 U.S. at 648-49, 662-63. In Von Raab, where the testing regime was upheld despite the absence of a demonstrated drug problem, the Court noted that the case must be read in the unique context of federal workers whose primary task is drug interdiction. See Von Raab, 489 U.S. at 660. In

harmonizing these cases, the <u>Chandler</u> Court said that "[a] demonstrated problem of drug abuse, while not in all cases necessary to the validity of a testing regime, would shore up an assertion of special need for a suspicionless general search program. Proof of unlawful drug use may help to clarify—and to substantiate—the precise hazards posed by such use." <u>Chandler</u>, 117 S. Ct. at 1303.

Second, the Court examined whether the testing scheme met the related goals of detection and deterrence. <u>See</u> <u>id</u>. at 1304. The Court found it significant that Georgia's drug testing scheme was neither well-designed to detect drug use among political candidates, nor was it "a credible means to deter illicit drug" use among the target group. <u>Id</u>. The test date was known by the candidates well in advance, and thus, "users of illegal drugs, save for those prohibitively addicted, could abstain for a pretest period sufficient to avoid detection." <u>Id.</u> In contrast, the testing regimes upheld in <u>Skinner</u>, <u>Von Raab</u>, and <u>Acton</u> were quite effective at discovering drug users and deterring drug use. <u>See</u> <u>id.</u> at 1303. For instance, in <u>Skinner</u>, testing of railroad employees occurred immediately after certain triggering events, such as railroad accidents, "the timing of which no employee [could] predict with certainty." <u>See</u> <u>Skinner</u>, 489 U.S. at 630. The Court determined that the unpredictability of timing for the tests would "significantly increase the deterrent effect." <u>Id</u>. Similarly, in <u>Von Raab</u>, testing of customs officials occurred upon transfer or promotion, the timing of which could also not be precisely foreseen. <u>See</u> <u>Chandler</u>, 117 S. Ct. at 1304 n.4 (citing <u>Von Raab</u>, 489 U.S. at 660). In <u>Acton</u>, the drug testing focused

on student-athletes, who were considered role models by the other students. In this way, the school's drug problem was "effectively addressed by making sure that athletes do not use drugs." Acton, 515 U.S. at 663.

In light of the Supreme Court's analysis in Chandler, the special need showing is best viewed as a preliminary examination of the government interests at stake. While the testing program's ultimate validity depends on a comparison of the government interests and privacy interests, the government must also be able to show, as a threshold matter, that its case for suspicionless testing is legitimate. Thus, even if the privacy interest is virtually non-existent, the special need requirement prevents suspicionless searches where the government has failed to show either that it has a real interest in testing or that its test will further its proffered interest. See id. at 1303 ("[T]he testing method the Georgia statute describes is relatively noninvasive; therefore, if the "special need" showing had been made, the State could not be faulted for excessive intrusion."). If we are able to conclude that the government's proffered concerns are "real," see Chandler, 117 S. Ct. at 1303, and that the challenged test is an effective means of addressing those concerns, the special need showing has been made. Nevertheless, we must still conduct the balancing test by weighing the government's interest in conducting suspicionless testing against the privacy interests at stake, which we evaluate by inquiring into the invasiveness of the privacy intrusion and the nature of the individual's privacy expectation. See Acton, 515 U.S. at 654, 658.

Applying these considerations to the policy before us, we find that the City has failed to show a special need for its drug testing policy. We note that the City's proffered rationale for adopting its drug-testing program was a concern for workplace and public safety and employee health, and we do not discount this rationale. Indeed, these concerns seem very real to us, unlike the concerns proffered in Chandler, despite the absence of a documented drug problem among the mechanics or any evidence that drug use by the mechanics has resulted in accidents involving the City's trash trucks. The mechanics clearly perform a job in which safety is an important concern. Cf. Skinner, 489 U.S. at 620 (upholding drug-testing scheme that tested, among others, "those engaged in maintenance and repair of signal systems"); National Federation of Federal Employees v. Cheney, 884 F.2d 603 (D.C. Cir. 1989) (classifying aviation mechanics as holding safety sensitive positions and upholding testing scheme as to them). They work in an industrial repair shop where large machines and parts are mechanically lifted for repairs, and the trucks that they repair are released back onto city streets. The City has a significant interest in ensuring that its employees do not operate heavy machinery in a dangerous manner, endangering others in the shop, or conduct repairs improperly, imperiling individuals on the public streets.

Nevertheless, the City is unable to satisfy the second part of the special need showing. The manner in which the City's drug-testing policy is executed indicates that it lacks a real capacity to address drug use in the workplace. First of all, the drug tests

-11-

occur in predictable intervals--when a mechanic obtains or renews a CDL. Thus, a mechanic should know well in advance when he will have to produce a specimen, and can easily evade detection merely by detoxifying his system prior to the tests. Additionally, the tests are very limited in frequency. Renewal of a CDL occurs only once every four years. Although frequent testing is not necessarily required to establish the efficacy of a drug testing program, the City has failed to show that its infrequent testing would effectively detect and deter drug use. Therefore, this program is not at all well-designed to detect drug use among its employees and lacks any deterrent effect. Cf. Chandler, 117 S. Ct. at 1304 (noting that 30 days advance notice of test date made it easy for any drug-using candidates to avoid detection). Indeed, even though the mechanics' repair work is not inspected before the trucks are returned to service, the general day-to-day scrutiny that they experience in the workplace serves more of a deterrent effect than this testing scheme. Compare Chandler, 117 S. Ct. at 1304 (noting that political candidates "are subject to relentless scrutiny" that would make it difficult for a candidate to hide a drug abuse problem) with Von Raab, 489 S. Ct. at 674 (explaining that detecting drug impairment on the part of employees such as Customs agents is particularly difficult because they do not operate under "the kind of day-to-day scrutiny that is the norm in more traditional office environments").

In the end, we must evaluate whether the safety and health concerns cited by the City would genuinely be advanced by the testing program. While we recognize that the

City has important safety and health concerns in testing its mechanics for drug use, given that the scheme that the City devised would not effectively detect or deter drug use, we must conclude that the City has failed to show a special need for suspicionless drug testing. Because we find that the program is not based on a special governmental need, we do not need proceed to balance the parties' respective interests. The judgment is therefore AFFIRMED.

No. 96-2177, <u>Solid Waste Mechanics v. City of Albuquerque</u>

BRISCOE, Circuit Judge, concurring:

I concur in the majority's affirmance of the district court's judgment in favor of plaintiffs. I write separately because I do not believe the City has demonstrated a real and immediate interest in conducting suspicionless drug testing of mechanics in its Solid Waste Department.

To pass constitutional muster, the City's "proffered special need for drug testing must be substantial -- important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." <u>Chandler v. Miller</u>, 117 S. Ct. 1295, 1303 (1997). In deciding whether the City has met this difficult standard, the initial focus is on "the nature and immediacy of the governmental concern at issue." <u>Vernonia School District 47J v. Acton</u>, 515 U.S. 646, 660 (1995).

Here, there is little evidence of what actually motivated the City to subject mechanics in the Solid Waste Department to suspicionless drug testing. For the most part, we have only the City's arguments as presented to the district court and to this court. At best, there is a general policy statement in the City's Administrative Instruction No. 123 that the City has an "interest in maintaining safe, healthful and efficient working conditions for its employees," and that "[b]eing under the influence of alcohol, or the presence of certain drugs in the body system, may pose serious safety and health risks not only to the user but to all those in contact with the user." However, this rationale could

arguably be applied to any and all City employees and, in my opinion, it does not rise to the level of a real and immediate interest that could justify suspicionless drug testing.

Notably absent is any evidence suggesting a past history of drug use among mechanics in the Solid Waste Department (or, for that matter, among any City employees), or even any fear or suspicion of such drug use. Although such evidence may not always be necessary, the Supreme Court has emphasized that such evidence will "shore up an assertion of special need" by helping to "clarify" and "substantiate . . . the precise hazards posed by such use." Chandler, 117 S. Ct. at 1303. Indeed, two of three cases where the Supreme Court has approved suspicionless drug testing involved evidence of actual drug abuse problems among the target populations. See Skinner v. Railway Labor Executives' Assoc., 489 U.S. 602, 607 (1989) (governmental concern in preventing railway accidents was motivated by findings of drug use by railroad employees nationwide, as well as by evidence that drug and alcohol use had been probable cause or contributing factor in prior accidents); Vernonia, 515 U.S. at 662-63 (challenged drug testing program was implemented because large segment of high school student body, particularly student-athletes, were in "a state of rebellion . . . fueled by alcohol and drug abuse as well as by [their] misperceptions about the drug culture"); see also Chandler, 117 S. Ct. at 1303 (rejecting random drug test that was not motivated by any evidence of a "concrete danger" or a history of drug abuse by persons subject to test).

Nor has the City adequately demonstrated plaintiffs' job responsibilities are such that suspicionless drug testing is justified in the absence of a demonstrated problem of drug use. In <u>Von Raab</u>, the Supreme Court approved suspicionless drug testing of certain Customs Service employees even though there was no concrete evidence of a problem of drug use among such employees. However, as the Court subsequently emphasized in <u>Chandler</u>, "<u>Von Raab</u> must be read in its unique context." 117 S. Ct. at 1304. Specifically, the Customs Service employees at issue in <u>Von Raab</u> were either "directly involved [in] drug interdiction or otherwise required . . . to carry a firearm," were routinely exposed to organized crime and illegal contraband, and had been frequent targets of bribery by drug smugglers. <u>Id.</u> Based upon these job tasks and associated risks, the Supreme Court concluded "the Government ha[d] a compelling interest in ensuring that front-line interdiction personnel [we]re physically fit, and ha[d] unimpeachable integrity and judgment." <u>Von Raab</u>, 489 U.S. at 670. Similarly, the Court concluded there was a governmental interest in "prevent[ing] the promotion of drug users to positions that require[d] the incumbent to carry a firearm, even if the incumbent wa[s] not engaged directly in the interdiction of drugs." <u>Id.</u>

Here, there is a troubling lack of evidence concerning what tasks are actually performed by plaintiffs.[1] Even overlooking this problem, I am not convinced the tasks

---

[1] The City's motion for summary judgment contained a limited number of statements regarding plaintiffs' job responsibilities. Although the City cited to deposition testimony to support those statements, none of the cited testimony was attached to the City's motion or otherwise included in the record on appeal. Further, there was no indication the cited testimony

performed and the risks faced by plaintiffs are sufficiently comparable to the employees in <u>Von Raab</u> to allow us to conclude the City has a special interest that justifies departure from the Fourth Amendment's usual requirement of reasonable individualized suspicion. Thus, I agree with the district court's conclusion on this point: "On the record before me, I cannot conclude that solid waste mechanics have a significant impact upon the safety of the public, that they expose other employees to hazardous conditions or that their specific job requirements require responsibility for the safety of others." Memorandum Opinion and Order at 9.

Finally, it should be noted that the record on appeal contains evidence (i.e., an affidavit from Assistant City Attorney Peggy Hardwick) suggesting plaintiffs were subjected to drug testing solely because of the City's alleged interest in maintaining consistent policies with respect to all mechanics employed by the City and not because of any safety or health concerns peculiar to plaintiffs' positions. As the district court concluded after reviewing this evidence, "[i]t appears that the primary reason the [C]ity . . . included" plaintiffs in its random drug testing policy was "the [C]ity's administrative convenience." <u>Id.</u> at 10.

For these reasons, the only conclusion that can be reached is that the City's alleged interests in random testing are, like the government concerns alleged in <u>Chandler,</u> "hypothetical" rather than "real." 117 S. Ct. at 1303.

---

was submitted to the district court.