TRANSPORTATION INSTITUTE, et al., Plaintiffs,

v.

UNITED STATES COAST GUARD, et al., Defendants.

DISTRICT 2, MARINE ENGINEERS BENEFICIAL ASSOCIATION—Associated Maritime Officers, AFL–CIO, Plaintiffs,

v.

James H. BURNLEY, IV, Secretary of Transportation, et al., Defendants.

Civ. A. Nos. 88–3429, 89–1519.

United States District Court, District of Columbia.

Dec. 18, 1989.

Sean Connelly, Brand & Lowell, Washington, D.C., for Transportation Institute.

Joan Torzewski, Lackey, Nussbaum, Harris, Reny & Torzewski, Taylor, Mich., for Marine Engineers, etc.

Mary G. Gotten, Peter Robbins, Civ. Div. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

This consolidated action is before the Court on cross motions for summary judgment. Plaintiffs in both cases seek to enjoin the implementation of drug testing regulations promulgated on November 21, 1988, by the United States Coast Guard mandating urinalysis drug testing of private citizens employed aboard commercial vessels.

In the posture of a motion for preliminary injunction, this Court has already considered the regulations at issue here. On July 21, 1989, the Court issued an Order denying plaintiffs' motion for a preliminary injunction with respect to pre-employment testing conducted by employers of more than fifty persons scheduled to take effect July 21, 1989. On August 3, 1989, the Court issued a memorandum opinion providing the basis for its ruling. At that time, the Court limited its ruling to pre-employment testing by large employers, because that category of testing was the only one scheduled to take effect on June 21, 1989. The Court declined to consider the merits of regulations addressing periodic license application or renewal testing, random testing, post-casualty testing, and reasonable cause testing since these categories of testing were not scheduled to be implemented until various dates after December 21, 1989, and no irreparable injury could be shown by the plaintiffs if the Court failed to grant a preliminary injunction barring the implementation of regulations for those categories of tests.

Although the Court found it inappropriate to consider regulations covering all categories of testing in the posture of a motion for a preliminary injunction, consideration of the regulations covering all categories of testing is ripe in the present procedural posture: cross motions for summary judgment. In consideration of the parties' memoranda and numerous supplemental filings, the oral argument held on June 21, 1989, the entire record of the cases, and for the reasons stated below, defendants' motion for summary judgment shall be granted in part and denied in part and plaintiffs' motion for summary judgment shall be granted in part and denied in part.

## I. BACKGROUND

A. Plaintiffs in *Transportation Institute* are as follows:

(1) *Transportation Institute.* Transportation Institute is a private non-profit association of over 140 member companies engaged in foreign and domestic shipping trades as well as barge and tugboat operations on the Great Lakes, inland and coastal waterways. The Institute's members, which operate American-owned and American-crewed ships, include large (over 50 employees), medium (between 11–50 employees) and small (10 or fewer employees) employers of individuals who would be required to be tested. Transportation Institute represents the employers before the federal government and in their effort to effectuate a comprehensive national maritime policy.

(2) *Seafarers International Union, AFL–CIO.* Seafarers is a national labor organization representing seamen employed aboard U.S. flag commercial vessels operating between the U.S. and overseas as well as on the Great Lakes and inland waterways. Seafarers also represents applicants for employment under the rotary hiring hall system, pursuant to which employers hire seafarers for shipping jobs. The Coast Guard's drug testing rules expressly supersede collective bargaining

agreements negotiated by the Seafarers on behalf of its members.

(3) *Alvin Robinson.* Mr. Robinson is an individual member of Seafarers employed as a chief cook. Mr. Robinson would be subject to Government compelled drug testing under the Coast Guard rules.

(4) *David T. Manzanet.* Mr. Manzanet is an individual member of Seafarers employed as a bosun. Mr. Manzanet would be subject to Government compelled drug testing under the Coast Guard rules.

B. Plaintiffs in *District 2* are as follows:

(1) *District 2, Marine Engineers Beneficial Association—Associated Maritime Officers, AFL–CIO ("MEBA").* MEBA is a labor organization comprised of deck officers, radio officers, engineers, and stewards licensed and documented to work aboard United States flagged sailing vessels. Members of MEBA hold licenses that require them to undergo periodic physical examinations under federal regulations as part of the license renewal procedures.

(2) *Herbert J. Nelson.* Mr. Nelson is a licensed marine officer and a member of MEBA.

The Court finds that the above named and described plaintiffs have standing to challenge the regulations at issue here.

C. The Defendants in *Transportation Institute* and in *District 2* are as follows:

(1) *Admiral Paul A. Yost, Jr.* Admiral Yost is the Commandant of the United States Coast Guard, a federal agency within the Department of Transportation that promulgated the final drug-testing rules giving rise to both suits. He is being sued in his official capacity as Commandant of the Coast Guard.

(2) *James H. Burnley, IV.* James Burnley is the Secretary of the Department of Transportation. He is being sued only in his official capacity as head of the Department of Transportation (the federal agency having supervisory authority over the Coast Guard and the statutory authority to promulgate rules governing maritime safety).

D. *The Regulations*

On July 8, 1988, the Coast Guard published a Notice of Proposed Rulemaking in the Federal Register proposing drug abatement programs for merchant marine personnel, including drug testing of private employees aboard commercial vessels. 53 Fed.Reg. 25,926 (July 8, 1988). The Coast Guard issued final regulations requiring private drug testing on November 21, 1988. The regulations were made effective thirty days later, on December 21, 1988. The final rules require drug testing of "crewmembers," who are defined without exception as all individuals "[o]n board a vessel acting under the authority of a license, certificate of registry, or merchant mariner's document issued under this subchapter, whether or not the individual is a member of the vessel's crew." 53 Fed.Reg. at 47,079 (to be codified as 46 C.F.R. § 16.105). In addition, the rules include as "crewmembers" other individuals employed or engaged on board a U.S.-flag vessel required to be operated by one holding a license, certificate or document, except for three specified categories of excluded individuals (fish processors aboard fish processing vessels, scientific personnel aboard oceanographic research vessels, and individuals excluded under 46 C.F.R. Part 15 who have no duties directly affecting safety.) *Id.* at 47,079 (to be codified as 46 C.F.R. § 16.105).

The final rules require testing at five different stages:

(1) *Pre–Employment Testing.* Under the rules, employers are required to test individuals for drugs (not alcohol) prior to hiring them to serve as crewmembers. 53 Fed.Reg. at 47,067; *see id.* at 47,080 (to be codified as 46 C.F.R. § 16.210). This requirement applies to all prospective hires, except those who have either passed a pre-employment or periodic drug test within the past six months or have been subject to random drug testing during the past twelve months and have not failed or refused a test. *Id.* at 47,080 (to be codified as 46 C.F.R. § 16.210(b)).

(2) *Periodic License Application or Renewal Testing.* The rules also require individual applicants for licenses, certificates of registry, or merchant mariner's documents to be subject to periodic drug testing as part of their required physical examinations. *Id.* at 47,067; *see id.* at 47,080–81 (to be codified as 46 C.F.R. § 16.220). This drug testing requirement applies to all individuals, except those who can establish either that they have had such a test within the past six months or have been subject to random drug testing during the past twelve months and have not failed or refused a test. *Id.* at 47,080–81 (to be codified as 46 C.F.R. § 16.220(b)).

(3) *Random Testing.* Maritime employers are additionally required to institute programs for the random drug testing of crewmember employees. *Id.* at 47,067–68; *see id.* at 47,081 (to be codified as 46 C.F.R. § 16.230). Under the rule, "[t]he frequency of testing and the development of a random selection method for testing has been left to the employer." *Id.* at 47,068. The rule simply requires that employers test crewmembers "at an annual rate of not less than 50 percent," *id.* at 47,081 (to be codified as 46 C.F.R. § 16.230(c)), and that each crewmember have "a substantially equal chance of selection on a scientifically valid basis" throughout his employment. *Id.* (to be codified as 46 C.F.R. § 16.230(a)); *see also id.* at 47,068 ("no employee shall know in advance when such testing will occur").

(4) *Post–Casualty Testing.* Employers also must test, for drugs and alcohol, "all persons directly involved in a serious marine incident" without regard to whether there is any reason to believe drugs or alcohol were a contributing factor. *See id.* at 47,081 (to be codified as 46 C.F.R. § 16.240). A "serious marine incident" is generally defined to include any accident resulting in death, injury requiring medical treatment, property damage over $100,000, or loss of certain vessels, any discharge of 10,000 or more gallons of oil into navigable waters, or discharge of a reportable quantity of hazardous substance into the environment. *Id.* at 47,077 (to be codified as 46 C.F.R. § 4.03–2). An individual is considered "directly involved" in a serious marine incident if that individual's action or failure to act is determined to be, or cannot be ruled out as, a causative factor in the events leading to or causing a serious marine incident." The procedures for this type of testing are detailed in the regulations. *Id.* at 47,078–79 (to be codified as 46 C.F.R. §§ 4.06–1 to 4.06–60).

(5) *Reasonable Cause Testing.* Finally, the rules require employers to test any crewmember employee "reasonably suspected of using a dangerous drug ...." *Id.* at 47,081 (to be codified as 46 C.F.R. § 16.250(a)). The rules state that the "employer's decision to test must be based on a reasonable and articulable belief that the individual has used a dangerous drug based on direct observation of specific, contemporaneous physical, behavioral or performance indicators of probable use." *Id.* (to be codified as 46 C.F.R. § 16.250(b)).

The effective date of the drug testing rules, with certain exceptions for foreign flag vessels and foreign citizens aboard U.S. flag vessels, was December 21, 1988. *See id.* at 47,064. The date of required implementation, however, varies depending upon the size of the employer and the type of testing. Employers of more than 50 persons must implement the pre-employment testing no later than July 21, 1989,[1] and all other testing programs no later than December 21, 1989. *Id.* at 47,080 (to be codified as 46 C.F.R. § 16.105(a)). Employers of between 11–50 employees must implement the pre-employment, serious marine incident, and reasonable cause testing programs no later than December 21, 1989, and random testing no later than December 21, 1990. *Id.* (to be codified as 46 C.F.R. § 16.205(b)). Finally, employers of 10 or fewer employees must implement all types of drug testing programs no later than December 21, 1990. *Id.* (to be codified as 46 C.F.R. § 16.205(c)).

**1.** At the oral hearing on the motion for a preliminary injunction held on June 21, 1989, the Government agreed to extend the implementation date of pre-employment testing by large employers from June 21, 1989, to July 21, 1989.

## II. DISCUSSION

As discussed in this Court's memorandum opinion denying plaintiffs' motion for a preliminary injunction, many of the issues raised by the parties in their motions for summary judgment have been resolved by the Supreme Court's decisions in *National Treasury Employees Union v. Von Raab*, —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (hereinafter *"Von Raab"*), and *Skinner v. Railway Labor Executives' Association*, —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (hereinafter *"Skinner"*). This Circuit reached the same conclusion in *Harmon v. Thornburgh*, 878 F.2d 484, 487–488 (D.C.Cir.1989) (hereinafter *"Harmon"*), when it stated that certain general principles may be gleaned from *Skinner* and *Von Raab*.

■■■ First, urinalysis, if compelled by the Government, is a "search" subject to the restrictions of the Fourth Amendment. *See Skinner*, 109 S.Ct. at 1412–13; *Von Raab*, 109 S.Ct. at 1390. Second, even when such "searches" are conducted by private employers, the Government's encouragement, endorsement, and participation in the private employers' actions may suffice to implicate the Fourth Amendment. *See Skinner*, 109 S.Ct. at 1412. Third, individualized suspicion of a particular employee is not required by the Constitution. *See Skinner*, 109 S.Ct. at 1417; *Von Raab*, 109 S.Ct. at 1390. Fourth, it is not necessary to show that a documented drug problem exists within the particular work-place at issue. *See Von Raab*, 109 S.Ct. at 1395. ("The mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity.") Finally, when a Fourth Amendment intrusion "serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Harmon*, 878 F.2d at 488 (quoting *Von Raab*, 109 S.Ct. at 1390; accord, *Skinner*, 109 S.Ct. at 1413–14).

Following *Skinner*, *Von Raab*, and *Harmon*, this Court need not re-visit the issues of whether the Coast Guard drug testing regulations mandating testing by private employers constitute state action, whether such tests may be deemed "searches," and whether existing documentation of a drug problem in the merchant marine is sufficient to warrant the new regulations.[2] Rather, the Court's inquiry is confined to a determination of whether each category of proposed testing is "reasonable" as required by the Fourth Amendment's protection against unreasonable searches.[3]

■■ Generally, a search is not deemed reasonable unless it is accomplished pursu-

---

2. In addition, the Court will not reexamine the inability of urinalysis testing to show on-duty impairment. This challenge to drug testing has been rejected by the United States Court of Appeals for the District of Columbia in *National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir.1989). Additionally, the Supreme Court upheld urinalysis testing in *Skinner* and *Von Raab*, and this Circuit approved similar testing in *Harmon*, despite the inability of current tests to show on-duty impairment.

3. As the Court noted in *Skinner*:
 To hold that the Fourth Amendment is applicable to the drug and alcohol testing prescribed by the ... regulations is only to begin the inquiry into the standards governing such intrusions. *O'Connor v. Ortega*, 480 U.S. 709, 719 [107 S.Ct. 1492, 1499, 94 L.Ed.2d 714] ... (1987) (plurality opinion); *New Jersey v. T.L.O.*, 469 U.S. 325, 337 [105 S.Ct. 733, 740, 83 L.Ed.2d 720] ... (1985). For the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. *United States v. Sharpe*, 470 U.S. 675, 682 [105 S.Ct. 1568, 1573, 84 L.Ed.2d 605] ... (1985); *Schmerber v. California*, 384 U.S. [757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966)].... What is reasonable, of course, "depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 [105 S.Ct. 3304, 3308, 87 L.Ed.2d 381] ... (1985). Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. [648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)] ...; *United States v. Martinez-Fuerte*, 428 U.S. 543 [96 S.Ct. 3074, 49 L.Ed.2d 1116] ... (1976).
 *Skinner*, 109 S.Ct. at 1413–1414.

ant to a judicial warrant issued upon probable cause. The Supreme Court, however, has recognized exceptions to this rule when "special needs" beyond the normal need for law enforcement make the warrant and probable cause requirement impracticable. *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (search of probationer's home); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (search of student's property by school officials). In *Skinner* the Court found that such "special needs" existed, and held that the Government's interest in regulating the conduct of railroad employees to ensure safety presents a "special need" beyond normal law enforcement that may justify departure from the usual warrant and probable cause requirements when the covered employees are engaged in safety-sensitive tasks. *Skinner*, 109 S.Ct. at 1414. The Government's interest in regulating the conduct of maritime employees to ensure safety in the instant action is identical to the safety interest recognized in *Skinner*.

▪ When faced with such "special needs," the Court's task becomes one of balancing the Government's interest in safety against the individuals' privacy interests "to assess the practicality of the warrant and probable cause requirements in the particular context." *Skinner*, 109 S.Ct. at 1414 (citing *Griffin v. Wisconsin*, 107 S.Ct. 3164; *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). *See also Von Raab*, 109 S.Ct. 1384 and *Harmon*, 878 F.2d 484. It is to this balancing that the Court now turns for each category of testing proposed by the Government.[4]

**4.** The Supreme Court utilized this balancing analysis in *Von Raab* and *Skinner*, cases involving post-accident and pre-ascension testing, respectively. Although the regulations at issue here involve three additional categories of testing (pre-employment, periodic, and random), the same balancing analysis is to be undertaken. *National Federation of Federal Employees v. Che-*

## A. Pre-employment Testing

▪ This Court has already engaged in an extensive analysis of the interests of the parties for pre-employment testing when it considered the merits of plaintiffs' motion for a preliminary injunction. Although the Court considered the pre-employment testing solely as it applied to large employers, the Court finds that its analysis holds true for small and medium-sized employers as well. In an effort to provide a basis for the ruling it issues today, yet avoid redundancy, the Court will briefly outline its reasons for finding that the Government's compelling interest in maritime safety outweighs the diminished privacy interests of individuals subject to pre-employment testing.[5]

The Government's interests can be summarized in one word: safety. Incorporated into this safety interest are the interests of maintaining a drug-free work-place, deterring employees engaged in safety-sensitive tasks from using controlled substances, and ensuring that employees will be prepared to respond quickly and effectively in an emergency situation aboard a commercial vessel. These safety interests for the maritime industry are indistinguishable from those safety interests identified in *Skinner* for the railroad industry, which the Supreme Court found to be compelling. In each of the categories of testing analyzed by the Court, the Government's compelling interest in safety will be weighed against the individual's privacy interests to determine if the warrantless searches mandated by the regulations are reasonable under the Fourth Amendment.

The Court finds that prospective crewmembers' privacy interests are significantly diminished for a number of reasons. Pre-employment testing requires testing only on a single occasion, affects only job

*ney*, 884 F.2d 603, 608–609 (D.C.Cir.1989) *citing Harmon*, 878 F.2d at 489.

**5.** The Court refers the parties to its discussion of pre-employment testing in its memorandum opinion issued on August 3, 1989, and incorporates it by reference.

applicants, not employees, and can only be initiated by the prospective crewmember in his or her application for a job. *Harmon,* 878 F.2d at 489. The regulations endeavor to reduce the intrusiveness of the urine collection process, making it akin to procedures encountered in the context of a regular physical examination. *Skinner,* 109 S.Ct. at 1418. Physical examinations and drug testing are already widespread employment practices in the maritime industry and the industry is already heavily regulated. *See id. See also Von Raab,* 109 S.Ct. at 1397. Finally, pre-employment testing involves none of the employer discretion that is necessarily present in post-accident, for-cause, and random testing, since almost all prospective crewmembers are tested, with only limited exceptions.

In its memorandum opinion denying plaintiffs' motion for a preliminary injunction, the Court indicated that it was concerned with the broadly drawn categories of individuals subject to mandatory testing. Pre-employment testing regulations would apply to all applicants who wish to serve as crewmembers, regardless of their job descriptions. The broadly drawn categories of tested individuals are one factor which the Court weighs in its analysis of the privacy interests involved in each category of testing. Although it is a determinative issue in one category of testing, random testing, the Court does not find it determinative for the regulations providing for pre-employment testing. The Court finds that the intrusions placed on prospective crewmembers' privacy by pre-employment testing are limited and that the testing is reasonable under the Fourth Amendment.

Based on the foregoing, the Court concludes that on the issue of regulations providing for pre-employment testing, summary judgment should be granted for the defendants.

### B. Periodic License Application or Renewal Testing

■ The Government's interest in periodic testing is the same safety interest described above and is compelling. It must be weighed against the privacy interests of applicants for licenses, certificates of registry, or merchant mariner's documents, who, as part of their required physical examinations, will be subject to drug testing. The privacy interests of applicants for licenses, certificates of registry or merchant mariner's documents, and applicants for renewal of the above, are already considerably diminished. These individuals are already required to have a regular physical examination, and the drug testing will be conducted as part of that regular examination. Unlike random testing, periodic testing occurs at a pre-determined time, with advance notice, as a part of a process which the individual himself or herself initiates. *Von Raab,* 109 S.Ct. at 1394 n. 2, 1396 n. 4.

For the reasons the Court found the balance of interests tipping toward the Government in the category of pre-employment testing and because the testing will occur at a pre-determined time, with advance notice as part of a process which the individual initiates, the Court finds the Government's interest in conducting periodic license or renewal testing to outweigh the privacy interests of applicants for licenses. Accordingly, the Court holds that the regulations providing for periodic license application and renewal testing are permissible under the Fourth Amendment.

On the issue of regulations providing for periodic license application or renewal testing, the Court shall grant defendants' motion for summary judgment.

### C. Random Testing

■ The regulations providing for random drug testing present a different set of factors than the other categories of testing for the Court to consider in its balancing. Unlike pre-employment testing, the individuals who will be tested are not applicants for jobs, but are employees, whose privacy interests are greater than applicants. *Harmon,* 878 F.2d at 489. Unlike with periodic license application or renewal testing, the testing will not occur at a pre-determined time, with advance notice, as part of a process which the individual initiates. Random testing will not occur as a component

of a regularly scheduled physical examination, nor as a requirement of promotion. Random testing is not akin to post-casualty testing or reasonable cause testing, which are triggered by events or conduct of the individual. Instead, the regulations specifically provide that no employee shall know in advance when such testing will occur. 53 Fed.Reg. at 47,068. The individual's privacy interests as they relate to random testing are not diminished to the same extent as the individual's privacy interests with respect to other kinds of drug testing found valid here. Thus, random testing is more intrusive on the individual's privacy interests than with any other category of testing.

This greater intrusion heightens the Court's concern with the Coast Guard's broadly drawn categories of individuals subject to random testing. Plaintiffs assert that the Coast Guard's final regulations are over-inclusive and thus do not provide a sufficient nexus with the Government's asserted policy goal of safety. Plaintiffs allege that the Coast Guard has failed to show that everyone aboard a commercial ship directly affects the *safety* of the vessel's navigation or operations so as to create the compelling governmental interest in promulgating this rule. *See* 53 Fed.Reg. 47,065 (Nov. 21, 1988). Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction (*Transportation Institute*) at 13. Plaintiffs particularly identify persons in the deck department (*e.g.,* day men who perform deck maintenance duties such as painting), engine department (*e.g.,* wipers responsible for general cleaning in machinery spaces), and steward department (*e.g.,* cooks, galley utility cleaners, and messmen) as personnel whose positions are not "so safety-sensitive that drug testing is a necessary means of furthering a compelling government interest." *Id.* at 14.

Finally, plaintiffs argue that even if these individuals have *some* relationship to the safe operation of ships, that relationship is too attenuated to constitute a direct safety risk. Plaintiffs conclude that such an "indirect risk" to public safety is insufficient to justify drug testing because the chain of causation between misconduct and injury is too weak to constitute an immediate threat, as required under *Skinner* and *Von Raab* and this Circuit's recent opinions in *American Federation of Government Employees, AFL–CIO v. Skinner,* 885 F.2d 884 (D.C.Cir.1989) (hereinafter *"AFGE"*) and *National Federation of Federal Employees v. Cheney,* 884 F.2d 603 (D.C.Cir. 1989) (hereinafter *"Cheney"*).

The Government defends its broadly-drawn categories, arguing that *"all* crewmembers aboard inspected vessels must be assigned critical emergency duties by regulation," Defendants' Memorandum in Support of their Motion for Summary Judgment (*Transportation Institute*) at 33, and that *all* crewmembers, including engine wipers, radio operators, and stewards, are responsible for crucial safety-related functions in emergencies.[6] Essentially, the Government's argument comes down to an assertion that "[i]t requires no extensive analysis of job descriptions to realize that every hand on board must be prepared to heave to in an emergency." Defendants' Supplemental Memorandum, (*Transportation Institute*) at 8, n. 4.

The Court is uncomfortable relying on the Government's broad assertion that ev-

---

**6.** Defendants in *Transportation Institute* argue that "even employees at entry-level positions, such as [sic] 'wipers' in the engine department ... commonly are assigned firefighting, damage-control and abandon-ship duties that require them to be in an unimpaired condition." Defendants' Memorandum in Support of their Motion for Summary Judgment (*Transportation Institute*) at 33, n. 29. Similarly, Defendants in *District 2* contend that radio officers "perform duties directly related to safe vessel navigation, including critical emergency response functions ... [that] are as safety-sensitive as the responsi-

bilities of a train's operating crew ..." Defendant's Motion for Summary Judgment (*District 2*) at 18–19. Moreover, defendants assert that even stewards, "while not directly engaged in the navigation of the vessel, must be prepared at all times to perform critical, life-saving functions in emergencies.... The dangers to human life from the failure to properly perform abandon-ship procedures under serve [sic] storm conditions, or to properly execute firefighting procedures in the restricted confines of a passenger vessel, are obvious." *Id.* at 19.

ery crewmember's safety-related responsibilities are so direct and important that random testing as proposed by the Government is constitutionally permissible.[7] In *AFGE*, the Court found the privacy interests of employees occupying the three specifically challenged positions outweighed by the Department of Transportation's compelling interests in preventing drug use in such personnel based on specific findings regarding the job duties of each position. 885 F.2d 884. The three positions challenged were motor vehicle operators, FRA hazardous material inspectors, and FAA aircraft mechanics. The Court emphasized the "extraordinary safety sensitivity of the bulk of the covered positions." *AFGE* 885 F.2d at 890. With regard to the FRA inspectors, the Court found that their "exclusive assigned duties" were "intimately related to the prevention of public harm." *Id.* at 891. Random testing of FAA aircraft mechanics was upheld based on the Court's decision in *Cheney*, in which the Court relied on the irreversible and calamitous consequences of a single drug-related lapse by a covered employee. *Id.* at 892. Finally, random testing of motor vehicle operators was upheld because of their responsibilities in transporting visiting foreign dignitaries and key Department officials and in operating passenger-laden shuttle buses. *Id.* None of the characteristics which the Court found important in the three challenged positions in *AFGE* are shared by all crewmembers covered in the Coast Guard's regulations.

The Government emphasizes the gravity of the potential safety risk, as opposed to the focus on the immediacy of the safety threat articulated in *Harmon, Von Raab*, and *Skinner*. Plaintiffs contend that these cases limit a Court's consideration to evaluation of the immediacy of the potential safety threat, as opposed to the gravity. This limitation was negated by this Circuit in *Cheney*, which held that "the reasonableness of the testing plan [was] determined in part by the potential gravity of the feared harm," *Id.*, at 612. In that case, the Court was concerned with the threat to public safety posed by drug-impaired, armed officers, many of whom carried automatic weapons.

Regardless of which test the Court employs today, defendants still fail to convince the Court of the immediacy or gravity of the potential safety threat sufficient to mandate random drug testing for all employees currently covered in the Coast Guard's regulations. A drug-related lapse by a messman or wiper would not necessarily give rise to "irreversible and calamitous consequences." *Cheney*, 884 F.2d at 610. Nor do the tasks of cooks, messmen, wipers, or other such covered employees under the Coast Guard regulations approach the direct relationship to safety shared by the employees for whom random testing was found reasonable in *Cheney*—employees directly involved in the flying or servicing of aircraft and police/guard personnel. Thus, the gravity of the potential safety threat does not rise to the level found persuasive in *Cheney*.[8]

■ In *Harmon*, the Court upheld random testing of Justice Department employees holding top secret security clearances

---

7. The Court notes that written job descriptions, including assigned emergency tasks, were not produced for each covered position. At the oral argument, a one page, two-sided document entitled "Abstracts of Maritime Education and Training Publications: Job Descriptions" was produced for the Court which briefly summarized job descriptions for twenty-nine maritime workers. The minimal job descriptions underscore the Court's concern with the broadly drawn categories of workers subject to random testing, including those whose primary or even secondary responsibilities are not safety related. For example, the job description for "messman" is described as "[s]erves three meals a day and is responsible for cleanliness of messrooms. This title is an entry rating in the Steward

Department." An Assistant Cook is "[u]nder the direction of Chief Cook, assists in general galley cleaning and prepares raw vegetables for salads and for cooking." A wiper "[p]erforms general cleaning and other duties as assigned in the machinery spaces. This title is an entry rating in the Engine Department."

8. In *Cheney*, the Court of Appeals remarked on the "extraordinary peril" of the tasks performed by the employees in the covered positions at issue. The Court stated that "[a] single drug-related lapse by any covered employee could have irreversible and calamitous consequences." *Cheney*, 884 F.2d at 610.

and rejected plaintiffs efforts to draw distinctions (within the class of attorneys holding top secret security clearances) between attorneys who did and those who did not deal with top secret materials on a regular basis. The Court noted that "[t]he whole point of granting top secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises." *Harmon,* 878 F.2d at 492. Defendants assert that such line-drawing would be similarly inappropriate here, where an analogous need for flexibility exists in emergency situations aboard commercial vessels. However, merely because an individual employee is categorized with other employees who do hold jobs with direct safety responsibilities, cannot provide a constitutional basis to permit random testing of that individual employee. In *Cheney,* the Court refused to find reasonable the broad random testing of all civilian Army employees occupying chemical and nuclear surety positions within the Personnel Reliability Program.[9] The Court found unpersuasive the fact that a secretary in the PRP had been issued "protective equipment" and noted that it did not appear that she had access to chemical or nuclear materials.

The Court finds the defendants' "heave to" arguments unconvincing. While the Court does not question the Government's legitimate interest in safety, the issue it decides is whether that interest is sufficiently compelling to justify a warrantless, suspicionless search. *Harmon,* 878 F.2d at 490. The Court cannot find that random testing of such a broad category of employees is reasonable. *Von Raab* suggests that "a clear, direct nexus ... between the nature of the employee's duty and the nature of the feared violation" must exist for the Government to search its employees. *Harmon* 878 F.2d at 490. No such direct nexus between the duties of each of the crewmembers subject to random testing under the proposed regulations and the

safety concerns of the Government has been shown by the Government.

 The Court recognizes that a drug-related blunder by a wiper or cook could, through a chain of ensuing circumstances, lead to an emergency situation that is a threat to public safety. However, the chain of causation between the misconduct of a cook or wiper and injury is considerably more attenuated than that found persuasive for drug-related blunders by the air traffic controllers, pilots or guards in *Cheney.* Elongation of the causal chain in the name of public safety cannot provide a reasonable basis under the Fourth Amendment for a warrantless, suspicionless search.

 Several Courts have found it significant whether or not the covered employees work in a "traditional office environment," on the ground that working in such an environment would contribute to the ease with which drug use could be detected. *See Von Raab,* 109 S.Ct. at 1395; *Harmon,* 878 F.2d at 489; *Cheney,* 884 F.2d at 614. However, in this case, this significance diminishes. Although the crewmembers would not work in a "traditional office environment," the close and confined nature of a shipping vessel tends to lend itself to easy detection of drug abuse, making random testing less imperative.

The Court has not been shown that the governmental interest randomly testing all crewmembers for drugs in the interest of safety outweighs the crewmembers' privacy interests. The regulations providing for random testing, as currently drawn, cannot be sustained under the Fourth Amendment. As such, the Court will enjoin the implementation of the regulations providing for the random testing of all crewmembers.

It is likely, however, that some crewmen within the currently drawn regulations perform duties so directly tied to safety, that they could constitutionally be required to undergo random testing. *See Harmon,*

9. Chemical and nuclear sureties were "ostensibly" responsible for the custody, transportation, storage, maintenance, demilitarization, and security of surety materials. *Cheney* 884 F.2d at 611.

878 F.2d at 493. Given the minimal information the Court now has regarding the job and emergency duties of the various crewmembers, the Court will decline to draw lines which the Coast Guard itself has not drawn. The Court will leave the reformulation of the regulations providing for random testing to the Coast Guard. *Id.*

Based on the forgoing, the Court concludes that on the issue of regulations providing for random testing of all crewmembers, summary judgment should be granted for the plaintiffs.

### D. Post–Casualty Testing

■ The analysis of the interests to be weighed for post-casualty testing is controlled by the Supreme Court's recent decision in *Skinner*, 109 S.Ct. 1402. In *Skinner*, the Supreme Court sustained Federal Railroad Administration regulations which required blood and urine tests for train workers in the event of certain types of railroad accidents.[10] The Supreme Court based its decision on the "limited discretion exercised by the railroad employers under the regulations, the surpassing safety interests served by toxicological tests in this context, and the diminished expectation of privacy that attaches to the fitness of covered employees." *Id.*, at 1422.

The regulations for post-casualty drug testing in the case presently before the Court share these same characteristics. First, the maritime employers will exercise limited discretion in their implementation of the regulations for post-casualty testing. Plaintiffs suggest that the events specificized in the regulations are not sufficiently narrowly defined, and include obligations to test on the basis of such less serious events as any injury requiring medical at-

tention. *See* Plaintiffs' Reply Memorandum [*Transportation Institute*], at 13. However, the regulations confine post-casualty testing to "all persons directly involved in a *serious* marine incident." 53 Fed.Reg. at 47,081 (to be codified as 46 C.F.R. § 16.240). The regulations define both "serious marine incident" and "directly involved." *See supra* at 5–6. Plaintiffs further argue that the Coast Guard rules are not as precise as the FRA standards in *Skinner*.[11] The Court rejects this argument, and finds that the Coast Guard standards, while not identical to the Railroad standards at issue in *Skinner*, are as narrowly defined, and involve the same degree of employer discretion as was the case in *Skinner*.

Second, this Court has already held that the safety interests of the Government in the context of the maritime industry are as compelling as those identified for the railroad industry in *Skinner*. Third, the privacy interests of covered employees under the Coast Guard regulations are diminished in the context of post-casualty testing. Post-casualty testing is contingent on an event, which furnishes an indication that some dereliction of duty has occurred and requires concrete evidence that events have not gone as planned. *Harmon*, 878 F.2d at 488. As was the case in *Skinner*, post-casualty testing will help maritime employers obtain invaluable information about the causes of major accidents and enable them to take appropriate measures to safeguard the general public. *See AFGE*, 885 F.2d at 890–891, citing *Skinner*, 109 S.Ct. at 1420.

Accordingly, for the category of regulations covering post-casualty testing, the

---

**10.** These regulations also permitted, but did not require, the testing of employees who had been found to violate certain safety rules.

**11.** The FRA standards provide that railroads "shall take all practicable steps to assure that all covered employees of the railroad directly involved ... provide blood and urine samples for toxicological testing by FRA." § 219.203(a). Toxicological testing is required following a "major train accident," which is defined as any train accident that involves a fatality, the release of hazardous material accompanied by an evac-

uation or a reportable injury, or damage to railroad property of $500,000. § 219.201(a)(1). The railroad must collect urine and blood samples for testing after an "impact accident" which is defined as a collision resulting in a reportable injury, or in damage to railroad property of $50,000, or more. § 219.201(a)(2). Finally, the railroad must test after "[a]ny train incident that involves a fatality to any on duty railroad employee." § 219.201(a)(3). *Skinner*, 109 S.Ct. at 1408–1409.

Court shall grant defendants' motion for summary judgment.

### E. Reasonable Cause Testing

 Testing a crewmember on the basis of reasonable suspicion that he or she has used a dangerous drug does not transgress the Fourth Amendment.[12] *Skinner* makes clear that the government's interest in safety outweighs the privacy interest of crewmembers who are reasonably suspected to have used a dangerous drug based on direct observation of specific, contemporaneous physical, behavioral or performance indicators of probable use. *Id.* at 1409, 1422. *See also National Treasury Employees Union v. Lyng*, 706 F.Supp. 934 (D.D.C.1988) (holding that reasonable suspicion testing of employees was permissible, provided that such testing is based upon reasonable, articulable, and individualized suspicion that a specific employee may be under the influence of drugs while on duty), and *Bangert v. Hodel*, 705 F.Supp. 643 (D.D.C.1989) (holding that reasonable suspicion testing was permissible, provided that such testing is based upon reasonable suspicion of on-duty drug use or on-duty drug-related job impairment). The Court further notes that the diminished privacy interests of employees by virtue of their employment in a highly regulated industry also comes into play in the context of reasonable suspicion testing. Plaintiffs, perhaps realizing the difficulty they face arguing against the validity of this category of testing, resort to argument regarding delegation of law enforcement to untrained private citizens.[13] This argument fails.

The Government interest served by the regulations at issue here is public safety, not law enforcement.

Thus, the Court shall grant defendants' motion for summary judgment on the issue of regulations covering reasonable suspicion testing.

### III. STATUTORY CLAIMS

Plaintiffs also raise several statutory claims based on the Administrative Procedure Act, which the Court finds are insignificant.[14] Plaintiffs assert that the Coast Guard regulations constitute arbitrary agency action in excess of statutory authority, in violation of 5 U.S.C. § 706(2)(A) and (E). Pursuant to this section, Courts must hold unlawful and set aside agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations or short of statutory right." 5 U.S.C. § 706(2)(A) and (C).

 Plaintiffs claim that the regulations exceed statutory authority. This argument lacks merit. The Secretary of Transportation is statutorily authorized to promote maritime safety through the lawful regulation of commercial vessels and crewmembers employed aboard those vessels. 46 U.S.C. § 2103 ("Superintendence of the merchant marine"), § 3306 ("Regulations"), § 6101 ("Marine casualties and reporting"), § 6301 ("Investigation of marine casualties"), § 7101 ("Issuing and classifying licenses and certificates of registry"),

---

**12.** Testing on the basis of reasonable suspicion is limited to those times when an employer has "a reasonable and articulable belief ... based on direct observation of specific, contemporaneous physical, behavioral or performance indicators of probable use." 53 Fed.Reg. 47,081 (to be codified as 46 C.F.R. § 16.250(b)).

**13.** Plaintiffs argue that "[t]he constitutional problem in this area is not so much that the reasonable cause standards are flawed, but rather is that enforcement of those inherently imprecise law enforcement standards is being delegated to some ill-defined group of untrained private citizens." Plaintiffs' Reply Memorandum [Transportation Institute], at 12.

**14.** The Court is cognizant that ordinarily the Court should avoid construing constitutional claims when the opportunity exists to decide claims on statutory grounds. The plaintiffs' statutory claims, however, do not go to the crux of the legal issues that have surrounded the cases brought challenging drug testing, which almost exclusively have been briefed and decided on constitutional grounds. Thus, although plaintiffs pleaded statutory claims, the Court finds that they are insignificant, particularly given the minimal treatment that parties gave to the statutory claims in their briefs. However, since the Court's decision today is dispositive of the case, the Court will briefly examine the statutory claims.

§ 7306 ("General requirements and classifications for able seamen"), § 7313 ("General requirements for members of engine departments"), and § 7314 ("Service requirements for qualified members of engine departments").

▪ Plaintiffs further claim that the regulations are arbitrary and capricious because the Coast Guard arbitrarily distinguished between U.S. and foreign-flag ships and U.S. and foreign citizens.[15] However, "[i]t has never been the law that the government is forbidden from addressing a problem unless it addresses all other problems of similar magnitude." *AFGE*, 885 F.2d 884, 897 (D.C.Cir.1989), citing *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Accordingly, this statutory claim must fail.

▪ The only partially valid statutory claim raised by plaintiffs is that the Coast Guard arbitrarily extended the regulations to cover virtually all crewmembers aboard U.S.-flag vessels without considering whether their individual jobs are safety-sensitive. The Court has found that the regulations for random testing of all crewmembers is violative of the Fourth Amendment. Thus, the Court holds that it will set aside the Coast Guard's regulations providing for random testing, not because they are arbitrary and capricious, as plaintiff contends, but because they are "not in accordance with law," and "contrary to constitutional right." 5 U.S.C. § 706(2)(A) and (B).

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is denied in part and granted in part and defendants' motion for summary judgment is denied in part and granted in part.

Plaintiffs' motion for summary judgment is granted in part with respect to the Court's holding that the Coast Guard's regulations providing for random testing of all crewmembers is violative of the Fourth Amendment. Accordingly, the defendants are enjoined from implementing the current regulations which provide for random testing of all crewmembers. The Coast Guard remains free to promulgate new, narrower regulations, subject to this Court's review.

Defendants' motion for summary judgment is granted in part with respect to the Court's holding that the Coast Guard's regulations providing for pre-employment testing, periodic license application or renewal testing, post-casualty testing, and reasonable cause testing do not violate the Fourth Amendment. Accordingly, the Court will not enjoin the implementation of these categories of testing regulations.

An order in accordance with this memorandum opinion is issued herewith.

## ORDER

In accordance with the memorandum opinion issued herewith and for the reasons stated therein, it is this 18th day of December, 1989,

ORDERED that plaintiffs' motion for summary judgment shall be granted in part and denied in part. Plaintiffs' motion shall be granted with respect to regulations providing for random testing. Accordingly, defendants are permanently enjoined from implementing the Coast Guard's regulations, as currently drawn, providing for the random testing of crewmembers. Plaintiffs' motion shall be denied with respect to regulations providing for pre-employment testing, periodic license application or re-

---

**15.** The Court is limiting its analysis of the statutory claims to those in the body of its opinion. Plaintiff also claimed in their complaint that defendants arbitrarily estimated the costs and benefits of the regulations under the Regulatory Flexibility and Paperwork Reduction Acts and other executive orders; arbitrarily concluded that the rules raise no federalism issues; and improperly delegated government responsibility and authority to private employers who must test and pay for drug tests of their employees. The Court will not consider the merits of these claims, since they constitute only a facial challenge to the Coast Guard's testing program. *See American Federation of Gov. Employees v. Skinner,* 885 F.2d at 897. None of these points was briefed by the parties, nor were they addressed at the oral argument for the preliminary injunction.

newal testing, post-casualty testing, and reasonable cause testing; and it is

FURTHER ORDERED that defendants' motion for summary judgment shall be granted in part and denied in part. Defendants' motion shall be granted with respect to regulations providing for pre-employment testing, periodic license application or renewal testing, post-casualty testing, and reasonable cause testing. Defendants' motion shall be denied with respect to regulations providing for random testing; and it is

FURTHER ORDERED that these actions shall be dismissed.